**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deanna Cook, | ) No. CV 11-0938-PHX-DGC |
| Plaintiff, | ) **ORDER** |
| v. | ) |
| Scottsdale Insurance Company; Nationwide Mutual Insurance Company, | ) |
| Defendants. | ) |

Defendants have filed a Motion for Summary Judgment. Doc. 60. The matter is fully briefed. Doc. 65-66 & 71-72. The Court has determined that oral argument would not materially assist its ruling. The motion will be granted in part and denied in part.[1]

**I.   Background Facts.**

Defendant Scottsdale Insurance Company ("SIC") hired Plaintiff on March 20, 2003 as a Senior Claims Representative. Doc. 61, Defendants' Statement of Facts ("DSOF") ¶ 8. In June 2005, Plaintiff was promoted to Senior Claims Specialist in SIC's Technical Resource Center ("TRC") where her duties included providing technical advice to claims

---

[1] Defendants have moved to strike several of Plaintiff's factual assertions under LRCiv 7.1(m)(3). Doc. 71 at 3, nn. 4, 5. There is no such local rule. Local Rule 7.2(m)(2) makes clear that parties may object to factual assertions made in motions, but should not move to strike them. Defendants' motion to strike will therefore be denied, as will Plaintiff's Motion for Leave to File Response to Objections. Doc. 73. The Court has considered the parties' objections to evidence in preparing this order.

representatives and managers regarding business insurance claims. DSOF ¶¶ 9-10. TRC Senior Claims Manager Paul Balentine was her direct supervisor. DSOF ¶ 12. Balentine's direct supervisor was Jon Reamer, Director of Claims and operational leader of the Line of Business department which included the Select Risk and Exposure unit and TRC. DSOF ¶¶ 13-14. The Claims Managers in Select Risk and Exposure were Gary Gray and Tom Grimes, both of whom reported directly to Reamer and whose duties included supervising the Claims Representatives. DSOF ¶¶ 16-17.

Plaintiff served as a consultant to the Select Risk and Exposure unit regarding construction defect claims. Plaintiff did not handle or resolve claims, did not have authority to make decisions on a file or issue checks to insureds, and had no supervisory duties. DSOF ¶¶ 18-19. Generally, a claims representative provided coverage analysis and policy and complaint review, and prepared the coverage letter explaining policy exclusions and conditions. DSOF ¶ 20. The coverage letter was routed for preliminary review to a Claims Manager such as Gray or Grimes and, if approved, was routed to Plaintiff for further review, approval, and possible edits. DSOF ¶ 20. Plaintiff therefore might express an opinion that conflicted with the opinions of other adjusters. DSOF ¶¶ 20-21. According to Plaintiff, she explained her reasoning in the claim file notes. Doc. 66, Plaintiff's Statement of Facts ("PSOF") ¶ 20. Claims Representatives and Claims Managers could seek advice from Plaintiff during the claim review process. DSOF ¶¶ 22. Plaintiff reviewed more than 5,000 coverage letters to SIC's insureds. DSOF ¶ 23.

**A.    Coverage Dispute Incidents and Plaintiff's Reassignment.**

In February 2008, Plaintiff and Gray had a coverage disagreement that was referred to Reamer for a final coverage decision. DSOF ¶¶ 37-38. In April 2008, Plaintiff sent an e-mail to Balentine expressing concern that Gray wanted her to approve matters even when she disagreed or believed the decision exposed the company financially. DSOF ¶ 40. Plaintiff denies her complaints regarding coverage decisions continued throughout 2008. DSOF ¶ 41; PSOF ¶ 41. Plaintiff's 2008 annual performance evaluation showed an "Achieves Criteria" rating, which was consistent with her previous year's rating. DSOF ¶¶ 42-43. According

to Plaintiff, her problems began in 2009 when the number of coverage disputes being referred to Reamer became unusually high. PSOF ¶¶ 37-38, 40-41.

In early 2009, Reamer instructed the TRC, the Claims Manager, and the Claims Representative to try and reach an "alignment around a position" before presenting the claim to him for a final coverage decision. DSOF ¶ 46. According to Defendants, after the "alignment meetings" were instituted, Reamer received about five claims disagreements between Plaintiff and Gray or Grimes. DSOF ¶ 47. Plaintiff recalled having about ten alignment meetings. PSOF ¶ 47.

On March 3, 2009, during a meeting over a disagreement about coverage interpretation, Gray and Plaintiff allegedly made pointed comments to each other about their differing interpretations. DSOF ¶¶ 49-50. Plaintiff denies making pointed comments and claims she was told during this meeting to align with improper denials of coverage because of concerns about the company's future financial stability. PSOF ¶ 49, Ex. 8, Cook Aff. ¶ 12. Reamer sent an e-mail following the meeting instructing Plaintiff to look at coverage with a "critical and skeptical eye" and focus "on opportunities where we can manage our expenses by fully and fairly evaluating whether or not a duty to defend truly exists." *Id.*; Doc. 61, Ex. D, Reamer Dep., Ex. 3 (e-mail dated 03/05/2009).

In about April of 2009, Plaintiff asked to be moved out of the Select Risk and Exposure unit so she would not have to work with Grimes or Gray. DSOF ¶¶ 51-52. According to Plaintiff, she asked to be moved to another group or department, not to a different unit within Reamer's department. PSOF ¶ 51, Ex. 8, Cook Aff. ¶ 20; *see* Doc. 61, Ex. E, Balentine Dep., Ex. 7 (e-mail dated 04/14/2009).

Regarding a July 2009 disagreement, Grimes purportedly opined that "endorsement is dead on to exclude coverage" and asked Plaintiff for "case law that holds differently." Plaintiff told Balentine that Grimes' request "was another example of aggressive responses" and mentioned she was again seeking "your help in removing me from this unfriendly environment." DSOF ¶ 54, Ex. E, Balentine Dep., Ex. 11 (e-mail dated 07/07/2009). Balentine did not find Grimes' request threatening or offensive. DSOF ¶ 55.

According to Plaintiff, she was instructed in the summer of 2009 to stop including her analysis in the claim file notes. PSOF ¶¶ 20, 123-24, 137. She also was instructed to stop sending e-mails about coverage disputes. PSOF ¶ 141.

Effective September 28, 2009, Plaintiff was moved from construction defect claims to general liability claims, allegedly consistent with her earlier request. DSOF ¶ 56. Plaintiff no longer worked with Gray and Grimes. There was no change to Plaintiff's title or compensation as a result of her new assignment, but Plaintiff alleges that the position was beneath her abilities and required little effort on her part. DSOF ¶ 57; Doc. 61-5 at 72.

**B.    Plaintiff's Ethics Complaint.**

On April 13 and 15, 2009, Plaintiff reported her concerns about SIC's coverage decisions to Defendant Nationwide's Office of Ethics. DSOF ¶¶ 58-60. Plaintiff identified 70 to 100 claims of concern. PSOF ¶ 119; Doc 72, ¶ 119. In June and July 2009, Plaintiff was contacted by Nationwide officials about her ethics complaint. DSOF ¶¶ 61-64. In August 2009, LeRoy Johnston, Vice President of Ethics and Compliance, requested that Plaintiff cooperate in the investigation and assured her retaliation was forbidden and names would be kept as confidential as possible. DSOF ¶ 65. Plaintiff met with Nationwide's ethics investigator at an offsite location on August 21, 2009. DSOF ¶ 66. In November 2009, the investigator contacted Balentine and Reamer and did not reveal Plaintiff's identity. Balentine and Reamer allegedly learned about the ethics complaint during this contact. DSOF ¶¶ 67-68.

**C.    The Appearance of a Conflict of Interest.**

In July 2009, Reamer and Balentine learned that Plaintiff had retained an SIC outside coverage attorney for a personal litigation matter without requesting permission. DSOF ¶¶ 69-70. Reamer and Balentine considered this a potential violation of the Conflict of Interest policy because Plaintiff, as a Senior Claims Specialist, could recommend or suggest that SIC obtain an opinion from coverage counsel. DSOF ¶¶ 70-72; PSOF ¶ 71. They reported the matter to SIC's Human Resources Department, which sought guidance from the Office of Ethics. DSOF ¶¶ 72-73. The Company Conflict of Interest policy provided that

1  "[a]ny situation that may create, or even appear to create a conflict between personal interests
2  and the interests of Nationwide must be avoided," and "gifts and favors from any company
3  or person who does business with . . . Nationwide may not be solicited." DSOF ¶ 74. The
4  Office of Ethics concluded the situation created an appearance of a conflict of interest and
5  asked Plaintiff to request a letter from the attorney stating he was not providing her with
6  special discounts or favors. DSOF ¶¶ 73 & 75-76. On September 16, 2009, Balentine sent
7  Plaintiff an Interoffice Memo summarizing the situation and reminding her not to engage in
8  potential violations of the Conflict of Interest policy in the future. DSOF ¶ 77, Ex. E,
9  Balentine Dep., Ex. 17 (Interoffice Memo dated 09/16/2009). Balentine and Reamer were
10 not aware of Plaintiff's ethics complaint when they raised concerns about Plaintiff's
11 relationship with the attorney or provided Plaintiff with the Interoffice Memo. DSOF ¶ 78.

**D.   Plaintiff's Separation From Defendants' Employment.**

Plaintiff applied for a position at Lockton Companies, LLC, in Denver, Colorado. Plaintiff's mother resided in Colorado. DSOF ¶¶ 79-80. Plaintiff interviewed on November 9, 2009, was offered a position on November 20, 2009, and accepted the position on December 7, 2009. DSOF ¶¶ 82-83. The offer was for a $115,000 annual salary, a $15,000 signing bonus, up to $10,000 relocation reimbursement expenses, an annual bonus and other benefits. DSOF ¶ 84. Plaintiff's salary at SIC at the time was $97,514.12. DSOF ¶ 85. Plaintiff submitted a termination notice to SIC on December 14, 2009, giving two weeks' notice and stating her last day would be December 25, 2009. DSOF ¶¶ 86-87, Ex. C, Cook Dep., Ex. 30 (Employment Termination Notice). Defendants accepted Plaintiff's resignation on December 14, 2009. DSOF ¶ 88.

**E.   Lawsuit.**

In 2010, SIC sued Plaintiff to recover confidential documents Plaintiff retained upon her separation from employment. DSOF ¶¶ 89-90, 94, 96-97, Ex. C, Cook Dep., Ex. 6. Plaintiff allegedly contacted opposing counsel in a lawsuit against SIC and provided counsel with the files. DSOF ¶ 95. Plaintiff and SIC settled their lawsuit and stipulated to a

dismissal of all claims with prejudice, each party to bear their own attorneys' fees and costs. The case was dismissed with prejudice. DSOF ¶ 98 & Ex. I.

### F. Plaintiff's Amended Complaint.

Plaintiff has asserted claims against both Defendants for statutory and common law wrongful discharge in violation of public policy (First and Third Claims), statutory and common law retaliatory discharge in violation of public policy (Second and Fourth Claims), and indemnification (Eighth Claim). Doc. 1, Am. Compl. Plaintiff's other claims were dismissed pursuant to the parties' stipulation. Docs. 58-59.

## II. Legal Standards.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Discussion.

### A. Plaintiff's Statutory Claims.

Plaintiff's First and Second Claims for wrongful and retaliatory discharge are based on the Arizona Employment Protection Act ("AEPA"), A.R.S. §§ 23-1501(3)(c)(i) & (ii). Under these sections, an employee has a claim against an employer for employment termination if one or more of the following have occurred:

- 6 -

> The employer has terminated the employment relationship of an employee in retaliation for any of the following:
>
> (i)   The refusal by the employee to commit an act or omission that would violate the Constitution of Arizona or the statutes of this state.
>
> (ii)  The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state[.]

A.R.S. § 23-1501(3)(c)(i) & (ii).

Plaintiff contends that she was constructively discharged from SIC's employment. Constructive discharge under the AEPA is governed by A.R.S. § 23-1502, a statute never mentioned by Defendants and cited only in passing by Plaintiff. Under that statute, an employee may claim constructive discharge on the basis of "objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign," but only if the employee gave the employer 15 days' notice of the unpleasant conditions and satisfied other requirements before resigning. *See* § 23-1502(A)(1) & (B). If the employee failed to give the 15 days' notice or satisfy the other requirements, she must meet the heavier standard of showing "outrageous conduct by the employer" such as sexual harassment or threats of violence. See § 23-1502(A)(2). The 15 days' notice by the employee is not required if the employer fails to provide its employees with a specific employment notice set out in the statute. *See* § 23-1502(E).

Rather than addressing this statute, Defendants assert that the test for constructive discharge is found in *Pennsylvania State Police v. Suders*, 542 U.S. 129, 133 (2004), and requires an employee to show working conditions so intolerable that a reasonable person would have felt compelled to resign. Doc. 60 at 12. The Court assumes from Defendants' disregard of § 23-1502 that they either did not give the employment notice required by § 23-1502(E), or they gave the notice and Plaintiff complied with her 15 day notice and other requirements, either of which would entitle her to rely on AEPA's lower standard for

constructive discharge. The Court cannot apply the higher standard under § 23-1502(A)(2) without some showing that Defendants complied with the statute and Plaintiff did not, a showing Defendants do not make in their summary judgment papers. In ruling on summary judgment, the Court accordingly will ask whether Plaintiff has presented evidence to show "objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign." § 23-1502(A)(1).

Defendants concede for purposes of their summary judgment motion that Plaintiff reasonably believed SIC was violating state law regarding its coverage decisions and reported her concerns to Defendants. Doc. 60 at 11, n.10. Defendants argue that Plaintiff was not constructively discharged, there was no causal connection between Plaintiff's protected activity and Defendants' alleged retaliatory actions, and Defendants would have taken the same actions regarding Plaintiff's employment regardless of her protected activity.

### 1. Constructive Discharge.

Plaintiff cites the following series of incidents occurring in 2009.

Balentine and Reamer required her to attend alignment meetings because of her refusal to go along with alleged unlawful coverage denials, and threatened her job unless she went along with the alignment requested. Balentine and Reamer prevented her from adding notes to claim files or sending e-mails expressing her opinion about alleged wrongful coverage decisions. Gray physically threatened her at an alignment meeting in 2009. Doc. 65 at 4.

Defendants argue that being required to attend meetings to discuss differing interpretations is not an adverse employment action or an intolerable condition and Plaintiff's timeline of alleged harassing incidents undercuts her constructive discharge claim. Specifically, Plaintiff's disagreements with management over coverage claims began in February 2008 and Plaintiff's characterization of the 2008 disagreements as "normal occurrences" and "typical disagreements" (see PSOF ¶¶ 37, 40-41) is unsupported argument. Plaintiff's attendance at alignment meetings in early 2009 and Reamer's March 2009 e-mail that she look at coverage with a "skeptical eye" similarly show events too remote from her

1  December 2009 employment termination. Defendants argue that Plaintiff's fear she might
2  lose her job was subjective and not supported by the evidence. Doc. 60 at 13; Doc. 71 at 5.

3  Plaintiff complains that in 2009 she was prevented from transferring away from
4  Balentine and Reamer and, when she was transferred, it was to a position beneath her
5  abilities. Doc. 65 at 5. Defendants argue that Plaintiff requested the transfer, she was
6  granted a new position in the TRC, she stayed at the same pay and title, and she no longer
7  worked with Gray and Grimes. Plaintiff's annual performance ratings for 2008 and 2009
8  remained at "Achieved Criteria." Doc. 60 at 12-13.

9  Plaintiff contends that in 2009 she was denied requested vacation time based on
10 imposition of a new "first come first served" policy instead of the past practice of
11 determining priority based on seniority. Doc. 65 at 5. Defendants argue that Plaintiff's
12 January 2009 e-mail to Balentine shows that when she requested time off she suggested using
13 seniority as a reasonable alternative to deciding vacations based on first come, first serve,
14 indicating her knowledge of the procedure. Doc. 71 at 5 (citing PSOF ¶ 129); Doc. 66, Ex.
15 1, Cook Dep. at 104-09.

16 Plaintiff faults Balentine for granting her limited emergency leave compared to
17 another employee who received more leave. Doc. 65 at 5. Defendants argue that Plaintiff
18 requested emergency leave in September 2008 and April 2009 and it is undisputed Plaintiff
19 was the only employee under Balentine who was granted emergency leave in those years.
20 Doc. 71 at 6 (citing DSOF ¶ 36 & PSOF ¶ 36).

21 Plaintiff contends she received a written warning for the alleged appearance of a
22 conflict when no such appearance existed and other employees were not subject to such
23 discipline. Doc. 65 at 5. Defendants argue that Plaintiff received only an Interoffice Memo
24 regarding the appearance of a conflict and was not disciplined over the incident. Doc. 60 at
25 13; Doc. 71 at 6.

26 Defendants argue that Plaintiff applied for and accepted a higher paying position with
27 a company in Denver near where her mother lived. Plaintiff previously had been allowed to
28 work remotely from Colorado. Plaintiff was offered the position on November 20, 2009, but

- 9 -

did not accept until December 7, 2009 and allegedly offered to work for SIC until December 25, 2009. Doc. 60 at 13; Doc. 71 at 6. Plaintiff contends that she looked unsuccessfully for a position locally and by the summer of 2009 was experiencing physical illness, including headaches, stomach aches, nausea, insomnia, anxiety, and panic attacks as a result of her working conditions. Doc. 65 at 6; Doc. 66, PSOF ¶¶ 81, 86, 143, Ex. 1, Cook Dep. at 221 & Ex. 8, Cook Aff. ¶ 19. Plaintiff claims "[m]y supervisor, Balentine, on a number of occasions throughout 2009 told me that if I felt the working environment was too hostile then I should terminate my employment as no other position or relief would be forthcoming for me." Doc. 65 at 6; Doc. 66, PSOF ¶¶ 86-87, Ex. 8, Cook Aff. ¶ 18.

Whether working conditions are so intolerable as to justify a reasonable employee's decision to resign is generally a fact question for the jury. *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007) (citing *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996)). While a single isolated incident is not sufficient to support a finding of constructive discharge, the Ninth Circuit has upheld findings of constructive discharge in circumstances where the plaintiff was subjected to incidents of differential treatment occurring over a period of months or years. *Id*. An alleged improvement in working conditions in the time period immediately preceding an employee's resignation does not necessarily preclude the conclusion that an employee was constructively discharged. *Id*. at 627-30.

The Court concludes that Plaintiff has presented sufficient evidence to create a question of fact on whether she was subjected to "objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign." A.R.S. § 23-1502(A)(1). Plaintiff has presented evidence that the alignment meetings with Reamer, Balentine, and Gray or Grimes were not "for the purpose of helping me to understand. They were for the purpose of instructing me how to change my analysis and apply coverage in a manner intended to deny coverage and save money." Doc. 66, Ex. 1, Cook Dep. at 51-52, 92. She was called into these meetings and "placed in the predicament of being required to apply coverage inconsistent with what I believed to be correct[.]" *Id*., Cook Dep. at 95.

1 Reamer "came up with the concept" of alignment meetings and Plaintiff was the "only TRC
2 associate" required to attend them. Doc. 66, Ex. 2, Balentine Dep. at 128-29 & Ex. 3,
3 Reamer Dep. at 38. At a meeting in 2009, "Gary Gray came out of his seat at me. I thought
4 he might strike me." Doc. 66, Ex. 1, Cook Dep. at 52-53. Balentine told Plaintiff to stop
5 sending e-mails: "you need to stop this. It's going to affect your work, which could lead to
6 other things." Doc. 66, Ex. 2, Balentine Dep. at 129-30. Plaintiff's job was threatened in
7 2009: "the instruction to me by both Reamer and Balentine was if I didn't find a way to align
8 with their requests, that I could lose my job." Doc. 66, Ex. 1, Cook Dep. at 59-61. Plaintiff
9 was not transferred to another position until some months after she made her request (Doc.
10 61, Ex. E, Balentine Dep., Ex. 7, Cook e-mail dated 04/14/2009), she sought to be transferred
11 to "a group or department where neither Balentine or Reamer were involved" (Doc. 66, Ex.
12 8, Cook Aff. ¶ 20), and yet she was transferred to a less demanding position where Balentine
13 and Reamer remained her supervisors (Doc. 61, Ex. E, Balentine Dep. at 113; Doc. 66, Ex.
14 1, Cook Dep. at 68).

15 Defendants clearly disagree with much of this evidence and all of Plaintiff's
16 characterizations of the evidence. At the summary judgment stage, however, the Court "must
17 draw all reasonable inferences in favor of the non-moving party and, where disputed issues
18 of material fact exist, assume the version of the material facts asserted by the non-moving
19 party to be correct." *Mattos v. Agarano*, 661 F.3d 433, 439 (9th Cir. 2011) (en banc). Doing
20 so, the Court concludes that alignment meetings designed to force an employee to adopt
21 positions contrary to her legal and ethical views, threats of termination, physical intimidation
22 (as allegedly committed by Gray), placing severe limitations on an employee's ability to
23 record or communicate her views, and transferring the employee to a less demanding job
24 where she was still subject to the same supervisors, could be viewed as "objectively difficult
25 or unpleasant working conditions to the extent that a reasonable employee would feel
26 compelled to resign." § 23-1502(A)(1). The Court accordingly will deny Defendants request
27 for summary judgment on the constructive discharge issue.

28

### 2. **Causation.**

In an AEPA retaliation case, the employee must prove the conduct at issue was constitutionally protected and was a substantial or motivating factor in the employment termination. If the plaintiff discharges this burden, the defendant can escape liability by showing it would have taken the same action even in the absence of the protected conduct. *Revit v. First Advantage Tax Consulting Serv., LLC,* No. CV10-1653-PHX-DGC, 2012 WL 1230841 at *4-5 (D. Ariz. Apr. 12, 2012).

Defendants argue that Plaintiff's coverage complaints were not a substantial or motivating factor in her alleged constructive discharge. Defendants argue that her complaints regarding coverage decisions began in 2008, Plaintiff claims she was "demoted" to a new assignment but had no change in title or pay, the conflict of interest performance warning occurred in September 2009, and her 2008-2009 performance ratings remained positive. Defendants contend these events and being instructed to meet with co-workers regarding coverage disputes are not adverse employment actions.

For reasons explained above, the Court cannot agree with Defendants' argument. Plaintiff has presented evidence of a series events which, viewed in the light most favorable to her position, could constitute "objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign." A.R.S. § 23-1502(A)(1). The events appear to have been directly related to her opinions of SIC's claims handling practices. The Court cannot conclude as a matter of undisputed fact that her concerns about claims handling policies played no role in the events she claims caused her constructive discharge. Nor can the Court conclude from the timing of events that Plaintiff's claim fails as a matter of law. The Ninth Circuit has cautioned that "a specified time period cannot be a mechanically applied criterion" in considering whether an employment decision was retaliatory. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003). Plaintiff's alleged difficulties increased in 2009 as her concerns and expressions of concern about SIC's claims handling policies also increased. The Court cannot say that her expressions of

concern were so clearly removed in time from the events alleged to have constituted her constructive discharge that summary judgment can be granted for Defendants.

Defendants argue they would have taken the same action in the absence of the protected conduct. They assert that they acted on Plaintiff's request for reassignment, and that the conflict of interest memorandum was issued after consultation with the company's Office of Ethics. But Plaintiff's request for reassignment arose from the very difficulties caused by her allegedly protected conduct, and she has alleged more than the conflict of interest memorandum as the basis for her constructive discharge. A genuine issue of material fact precludes summary judgment.

### B.     Plaintiff's Common Law Claims.

Defendants argue that there is no claim for common law wrongful or retaliatory discharge in Arizona since the AEPA was enacted, and that Plaintiff's common law claims fail because they are based on the same conduct as her AEPA claims. Doc. 60 at 16. Plaintiff appears to concede this point, stating that she will stand on her AEPA claims. Doc. 65 at 14. This Court previously has held that an Arizona plaintiff does not have a common law claim for wrongful termination if the claim is based on the same conduct as the AEPA claim. *Revit,* 2012 WL 1230841 at *8. Defendants are entitled to summary judgment on Plaintiff's common law claims (Third and Fourth Claims).

### C.     Plaintiff's Indemnification Claim.

Plaintiff seeks indemnification of her expenses, including attorneys' fees, in defending against SIC's previous lawsuit. Plaintiff cites SIC's Amended and Restated Code of Regulations as providing that the company shall indemnify any person who is or was a party to a suit because that person is or was an employee of the company. Plaintiff contends the previous lawsuit resulted in no adjudication of her liability and the parties' settlement agreement allowed her to retain her employment related claims. Doc. 65 at 15-16.

The parties' settlement agreement and stipulation of dismissal in the previous lawsuit (Doc. 68 at ¶ 2), as well as the order dismissing the lawsuit entered by Judge Martone (Doc. 61, Ex. I), expressly provided that each party would bear its own attorneys' fees and

costs. Plaintiff has waived any claim to indemnification for her attorneys' fees and costs from that lawsuit, and Defendants are entitled to summary judgment.

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. 60) is **granted** as to Plaintiff's Third, Fourth and Eighth Claims and **denied** as to Plaintiff's First and Second Claims.

2. Plaintiff's Motion for Leave to File Response to Objections Raised on Defendants' Motion for Summary Judgment (Doc. 73) is **denied** as moot.

3. The Court will set a final pretrial conference by separate order.

DATED this 6th day of December, 2012.

David G. Campbell
United States District Judge